# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
Executive Director
*and Attorney-in-Chief*

Southern District of New York
*Jennifer L. Brown*
Attorney-in-Charge

March 30, 2020

**BY EMAIL**

Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

> Re:   **United States v. Nunzio Gentille,
> 19 Cr. 590 (KPF)**

Dear Judge Failla:

Your Honor will remember Nunzio Gentille, whose medical care at the Bronx Community Reentry Center was the subject of a *Fatico* hearing last October in this escape case. The Court sentenced him to six months' imprisonment, which Mr. Gentille will complete on or about April 27, 2020.

Mr. Gentille is held at MCC New York, where a cadre inmate has already tested positive for the coronavirus and other inmates are in quarantine. MCC has placed Mr. Gentille on its list of the inmates at highest risk of contracting and/or suffering acutely from COVID-19.

In light of Mr. Gentille's high risk and the short time he has left to serve, I ask the Court to modify his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(1). The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and it poses extraordinary risks to Mr. Gentille's health. The virus thrives in densely packed populations, and MCC is ill-equipped to contain the pandemic and to treat those who become ill.

Accordingly, the Court should modify Mr. Gentille's sentence to time served so that he can be released immediately and begin serving his five years of supervised release in his underlying case before Judge Nathan, 14 Cr. 608 (AJN).[1]

---

[1] This Court did not impose its own period of supervised release in this case, because of the period already imposed by Judge Nathan. When modifying its sentence under 18 U.S.C.

Honorable Katherine Polk Failla                                    March 30, 2020
United States District Judge                                                 Page 2

Attached for the Court's consideration in connection with this motion
are two expert affidavits, one that generally addresses the increased public
health risks from keeping at-risk inmates incarcerated during the pandemic
(Affidavit of Dr. Brie Williams, attached as **Exhibit A**); and one that
specifically addresses the conditions in MCC (Affidavit of Dr. Jonathan
Giftos, attached as **Exhibit B**).

1.      **Under the First Step Act, this Court has Broad Authority to
        Determine Whether Extraordinary and Compelling
        Circumstances Exist to Modify Mr. Gentille's Sentence.**

The First Step Act ("FSA") expressly permits Mr. Gentille to move this
Court to reduce his term of imprisonment and seek compassionate release.
*See* 18 U.S.C. § 3583(c)(1)(A)(i).  Under normal circumstances, a defendant
can seek recourse through the courts after either (1) the BOP declines to file
such a motion on his behalf; or (2) there has been of lapse of 30 days from the
warden's receipt of the defendant's request, whichever is earlier.  *Id.*  On
March 28, 2020, I transmitted by email Mr. Gentille's request to the warden
of MCC.  Although the BOP has yet to rule on the request (and 30 days have
yet to pass), I am filing this motion now in light of the urgent nature of this
matter.  As discussed below, the Court may adjudicate it without delay.

After the administrative process is exhausted (or waived), a court "may
reduce the term of imprisonment (and may impose a term of probation or
supervised release with or without conditions that does not exceed the
unserved portion of the original term of imprisonment), after considering the
factors set forth in section 3553(a) to the extent that they are applicable, if it
finds that . . . extraordinary and compelling reasons warrant such a
reduction."  § 3583(c)(1)(A)(i); *see also United States v. Ebbers*, 2020 WL
91399, at *4, 02-CR-1144 (VEC) (ECF No. 384) (S.D.N.Y. Jan. 8, 2020).
Although the Court must also consider the applicable policy statements
issued by the Sentencing Commission, those (pre-First-Step-Act) statements
do not constrain the court's independent assessment of whether
"extraordinary and compelling" reasons warrant a sentence reduction in light
of the First Step Act's amendments.  *United States v. Beck*, 2019 WL
2716505, at *5–6 (M.D.N.C. June 28, 2019); *see also Ebbers*, 2020 WL 91399,
at *4.  Indeed, "the district courts themselves have the power to determine
what constitute extraordinary and compelling reasons for compassionate
release."  *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar.
4, 2020) (collecting cases).

---

§ 3582(c)(1)(A), the Court has the power to commute the remainder of Mr. Gentille's sentence
to a term of supervised release with the condition of home confinement if the Court deems
that more appropriate.

Honorable Katherine Polk Failla                          March 30, 2020
United States District Judge                                      Page 3

**2.    The unprecedented nature of this emergency requires the Court to find the exhaustion requirement waived.**

The Court need not and should not wait for Mr. Gentille to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to Mr. Gentille.  *See generally  Washington v. Barr*, 925 F.3d 109, 120–21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.").  In addition, Mr. Gentille has less the 30 days left to serve.

Federal courts have found that they can hear applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency.  *See United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF Docket No. 642 (D. Mass. Mar. 17, 2020) (granting defendant's emergency motion based on COVID-19); *see also United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of prisoner with terminal cancer).  This accords with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes.  *See, e.g., Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (*citing Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d at 119 (finding that administrative exhaustion requirements can be waived if delay would cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)).  Those policies were articulated by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749 (1975):

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

422 U.S. at 765.

Conducting an "intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in *Bowen* that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place." 476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); *see also Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the present crisis, the unique exhaustion provision in § 3582(c)(1)(A) places this case squarely within *Bowen*'s holding. Under § 3582(c)(1)(A), exhaustion will "merely [ ] enable [Defendants] to receive the procedure they should have been afforded in the first place"—it will simply advance by what could be a crucial thirty days this Court's consideration of Mr. Gentille's motion for compassionate release. *Bowen*, 476 U.S. at 484. To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be brought *either* by the "Director of the Bureau of Prisons, *or* upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . ." 18 U.S.C. § 3582(c)(1)(A) (emphasis added). In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear disputes in the absence of exhaustion. *Cf. Booth v. Churner*, 532 U.S. 731, 736 (2001) (failure to exhaust under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained in federal court because that provision explicitly provides that "*[n]o action shall be brought* with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added)).

Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept through MCC).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days. § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier . . . ." (emphasis added)). With this provision, Congress implicitly recognized that the policies underlying compassionate release are not furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic process. Congress' concerns about delay are even more pronounced in the current public health crisis.

The policies underlying such requirements would not be furthered by strict adherence in this instance. Giving the BOP time to decide administrative applications for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise." *Salfi*, 422 U.S. at 765. The BOP already has provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release. *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. And the MCC Legal Department has confirmed to counsel that it has no institution-specific requirements for requesting compassionate release and no specific procedure in place for compassionate release during this pandemic. Thus, it would be futile to force defendants to exhaust their administrative remedies—at the cost of their health and, potentially, their lives.

As discussed below, it is only a matter of time before COVID-19 spreads like wildfire in the prisons. As one Court held on March 19th:

> The Court is glad to hear that there are currently no reported cases of COVID-19 at Maguire, but is unsure what that means if people are not being tested. And, as the [prison's] management plan itself acknowledges, symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. That's why the Bay Area is on lockdown. We don't know who's infected. Accordingly, the government's suggestion that Toledo should wait until there is a confirmed outbreak of COVID-19 in Maguire before seeking release, *see* ECF No. 113 at 6 ("If the

Honorable Katherine Polk Failla                                    March 30, 2020
United States District Judge                                                Page 6

situation with respect to COVID-19 at Maguire changes, Toledo
is free to seek reconsideration of the issue at that point."), is
impractical.  By then it may be too late.

*In the Matter of the Extradition of Alejandro Toledo Manrique*, 2020 WL
1307109, at *1, 19-MJ-71055 (MAG) (TSH) (N.D. Cal., Mar. 19, 2020).

With the speed and unpredictability of this pandemic in New York
City—and given Mr. Gentille's expected release in less than 30 days—waiting
30 days will be too late.  Accordingly, this Court should exercise jurisdiction
over Mr. Gentille's emergency motion for compassionate release and dispense
with the BOP requirements under 18 U.S.C. § 3582(c)(1)(A)(i).

**3.      "Extraordinary and compelling reasons" warrant a one-month
          reduction in Mr. Gentille's sentence.**

**A.      The Dangerous Conditions at MCC**

The COVID-19 pandemic continues to roil New York City.  As of March
29, 2020, New York had over 59,000 confirmed positive cases, with over
33,000 of those cases in the city, and the number is projected to double every
three days, with the city deemed an "epicenter" of the crisis.[2]  COVID-19 is
already sweeping through the city's jails and prisons, too.  As of March 25,
2020, at least 52 inmates and prison employees at Rikers Island and other
city jails had tested positive for COVID-19.[3]  The infection rate in New York
City's jails is seven times the rate in the rest of the city.[4]  Federal facilities
are not immune: the BOP has confirmed at least one inmate case and three
staff cases at MDC Brooklyn and an inmate case at MCC New York.[5]  The
numbers are likely higher, as testing is limited.  *See, e.g.*, *In the Matter of the
Extradition of Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020)
(expressing concern about the infection rate within BOP facilities given that
"people are not being tested").  A number of other inmates are in quarantine
at both MDC Brooklyn and MCC New York.

---

[2] *See Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times, *available at*
https://nyti.ms/2UIkCz4.

[3] Sydney Periera, *Confirmed Coronavirus Cases Rise in New York Jails, Increasing Pressure
to Release People in Custody*, *available at* https://gothamist.com/news/confirmed-coronavirus-
cases-rise-nyc-jails-increasing-pressure-release-people-custody.

[4] *Coronavirus infection rate in NYC jails 7 times the rest of the city*, MSNBC (March 26,
2020), *available at* https://www.msnbc.com/all-in/watch/coronavirus-infection-rate-in-nyc-
jails-7-times-the-rest-of-the-city-81260101982.

[5] Federal Bureau of Prisons, COVID-19 Coronavirus, *available at*
https://www.bop.gov/coronavirus/index.jsp.

Honorable Katherine Polk Failla                                    March 30, 2020
United States District Judge                                                    Page 7

       Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. *See* Ex. A, Williams Aff. ¶ 14 ("Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons.  Inmates share small cells, eat together and use the same bathrooms and sinks.  . . . . They are not given tissues or sufficient hygiene supplies"); Joseph A. Bick, *Infection Control in Jails and Prisons*, Clinical Infectious Diseases 45(8) (2007) 1047-1055 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise").[6]  BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.[7]  Pretrial detention centers—like MCC—are even more imperiled, as detainees transit through weekly.  *See* Williams Aff. ¶ 13 ("The risk of exposure is particularly acute in pre-trial facilities where the inmate populations shift frequently").  Despite the general lockdown in New York State, BOP continues to transport inmates to and from MDC and MCC and has confirmed, on March 25, 2020, that it will not stop admitting new inmates.[8]  This exacerbates the risk of transmission. Though the BOP emphasizes that it screens inmates before moving them,[9] as the *Manrique* Court put it: "the [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected."  *Manrique*, 2020 WL 1307109, at *1.[10]

---

[6] *Available at* https://academic.oup.com/cid/article/45/8/1047/344842.

[7] *Federal Prison Workers Say Conflicting Orders on Coronavirus Response is Putting Lives at Risk*, CBS News (March 19, 2020), *available at* https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/;  Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), *available at* https://www.nytimes.com/2020/03/17/us/coronavirusprisons-jails.html; Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators.'"* NPR (March 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

[8] Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates: Sources*, ABC News (March 23, 2020), https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416%22;

[9] BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp.

[10] In fact, according to information the BOP provided to the U.S. Marshals Service, the positive case at MDC Brooklyn came from a new inmate who had left Rikers on March 16, 2020, was brought to MDC Brooklyn that evening, and passed all of MDC Brooklyn's screening tests.  He became symptomatic two days later and was sent to Lutheran Hospital for testing, and returned to the MDC Brooklyn to await the results.  Between March 16, 2020

Honorable Katherine Polk Failla                                    March 30, 2020
United States District Judge                                              Page 8

    MCC employees have reported that the facility is currently operating
with *less than half of its usual number of correctional officers*—and MCC is
already severely understaffed.[11]  According to one MCC employee, there is
almost no potential quarantine space for sick inmates.[12]  Speaking days
before the first MCC case was confirmed, the employee said "[o]nce that
whole thing spreads, no staff is going to come into work."[13]  According to
Southern District of New York Judge Alison Nathan, "in the event of an
outbreak at [MCC], substantial medical and security challenges would almost
certainly arise." *United States v. Dante Stephens*, 2020 WL 1295155, at *2
(S.D.N.Y. Mar. 19, 2020).

    Notably, MCC currently has only two doctors available to provide
medical care for approximately 700 detainees.  *See* Ex. B, Giftos Aff. ¶ 16.
The facility's horrendous conditions and lack of appropriate medical care for
detainees have been the subject of numerous, recent exposés.[14]  MCC has also
been the subject of numerous lawsuits. *See, e.g.*, *Rivera v. Fed. Bureau of
Prisons*, 368 F. Supp. 3d 741, 743 (S.D.N.Y. 2019); *Rodriguez v. Warden,
Metro. Corr. Facility*, 2015 WL 857817, at *2, 13-CV-3643 (PAC) (S.D.N.Y.
Feb. 27, 2015).  In the context of this unprecedented and rapidly evolving
emergency, MCC is ill-equipped to provide adequate medical attention to sick
detainees.

    In fact, MCC inmate who has already tested positive and those
inmates who are symptomatic are currently being held in isolation on Tier G
of 9-South in the Solitary Housing Unit at MCC.  The conditions of
confinement in Tier G have been well-documented:[15] these cells were built to
house the 9/11 defendants facing trial in the Southern District of New York,

---

and when the positive test result was received on March 21, 2020, this inmate had contact
with many other inmates and with correctional officers.

[11] Cassidy McDonald, "Federal Prison Workers Say Conflicting Orders on Coronavirus
Response is Putting Lives at Risk," *CBS News* (March 19, 2020), *available at*
https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/.

[12] *Id.*

[13] *Id.*

[14] Jeanne Theoharis, *I Tried to Tell the World about Epstein's Jail. No One Would Listen*, *The
Atlantic* (August 16, 2019), *available at*
https://www.theatlantic.com/ideas/archive/2019/08/real-scandal-mcc/596257/; Aviva Stahl,
*Prisoners endure a nightmare gulag in lower Manhattan hidden in plain sight*, The
Gothamist (June 19, 2019), *available at* https://gothamist.com/news/prisoners-endure-a-nightmare-gulag-in-lower-manhattan-hidden-in-plain-sight.

[15] *Id.*

and consist of a stone bed, an open toilet, and a sink.  The bed is not adjacent to any wall, and the tier is under the stairs and always cold and damp. Maintaining one's physical and mental health in such a cell is difficult at the best of times, let alone when one is suffering from a respiratory illness so debilitating and life-threatening as COVID-19.  Locked in a damp dark room lying on a stone bed while one is feverish, experiencing diarrhea, and gasping for breath is beyond any sentencing consequence this Court imposed or could have contemplated.

### B.    Mr. Gentille's Personal Circumstances.

The MCC has disclosed that as of March 25, 2020, nearly one-third of its current population is high-risk within the CDC's definition (205 inmates), creating a powerful likelihood that the coronavirus will spread throughout the facility, and particularly endanger the at-risk inmates, many of whom were already exposed to the virus by an inmate who tested positive and was housed on an open dorm unit with many of the at-risk inmates.

Mr. Gentille is on the MCC "high-risk" list.  Not every inmate on that list is eligible for bail or compassionate release.  But with less than one month left to serve, Mr. Gentille is.  This Court should reduce his sentence to time served for the health and safety of both Mr. Gentille and of every other inmate at MCC.

Mr. Gentille's high vulnerability to COVID-19 is an "extraordinary and compelling reasons" for his/her release.  *See* Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), *see* Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C).").  Here, Mr. Gentille's high susceptibility to COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there.  Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like MCC to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Mr. Gentille has already been identified as "high risk," this Court should find that Mr. Gentille's medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

In the last few days, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread.  For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island. [16] Approximately 1,700 inmates have been released from Los Angeles County Jails,[17] and 1,000 inmates are to be released from New Jersey jails.[18]  Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces.  So, too, should this Court.

Upon his release, Mr. Gentille can reside at an apartment belonging to his half-brother, Mark Muller, in Patchogue, New York.  Mr. Muller has confirmed that he will make this studio apartment available for Mr. Gentille, who can isolate himself there.

**4.    Conclusion**

For his health and that of others at MCC, the Court should reduce Mr. Gentille's sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Respectfully submitted,
 /s/
Clay H. Kaminsky
Assistant Federal Defender
Federal Defenders of New York
(212) 417-8749

CC:    AUSA Danielle Kudla

---

[16] https://www.cnbc.com/2020/03/24/coronavirus-new-york-city-to-release-300-nonviolent-inmates-from-rikers-island.html

[17] https://www.dailynews.com/2020/03/24/l-a-county-releases-1700-inmates-from-jail-early-to-prevent-coronavirus-outbreak-behind-bars/

[18] https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html

# EXHIBIT A

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                      :
                                                      :
                                                      :
                                                      :
                                                      :
                                                      :
APPLICATION FOR RELEASE FROM      :   **AFFIDAVIT OF BRIE WILLIAMS,**
CUSTODY                                               :   **M.D.**
                                                      :
                                                      :
                                                      :
                                                      :
                                                      :
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
```

I, Brie Williams, hereby affirm as follows:

1.      I am a doctor duly licensed to practice medicine in the State of California.

2.      I am currently a Professor of Medicine at the University of California, San Francisco ("UCSF") in the Geriatrics Division, Director of UCSF's Amend: Changing Correctional Culture Program, as well as Director of UCSF's Criminal Justice & Health Program. In that capacity, my clinical research has focused on improved responses to disability, cognitive impairment, and symptom distress in older or seriously ill prisoners; a more scientific development of compassionate release policies; and a broader inclusion of prisoners in national health datasets and in clinical research. I have developed new methods for responding to the unique health needs of criminal justice-involved older adults—including an evidence-based approach to reforming compassionate release policies and the design of a new tool to assess physical functioning in older prisoners. I was previously a consultant for the California Department of Corrections and Rehabilitation, as well as for other state prison systems.

3.      I have extensive experience working with vulnerable populations, in particular the incarcerated and the elderly.

4.      I submit this affidavit in support of any defendant seeking release from custody during the COVID-19 pandemic, so long as such release does not jeopardize public safety and the inmate can be released to a residence in which the inmate can comply with CDC social distancing guidelines.  The statements in this affidavit are based only on the current state of emergency and the circumstances described below.

**The Risk of Infection and Accelerated Transmission of COVID-19 within Jails and Prisons is Extraordinarily High.**

5.      Prisons and jails are not actually isolated from our communities: hundreds of thousands of correctional officers and correctional healthcare workers enter these facilities every day, returning to their families and to our communities at the end of their shifts, bringing back and forth to their families and neighbors and to incarcerated patients any exposures they have had during the day.  Access to testing for correctional staff has been "extremely limited," guards have reported a "short supply" of protective equipment, and prisons are not routinely or consistently screening correctional officers for symptoms.[1]

6.      The risk of exposure is particularly acute in pre-trial facilities where the inmate populations shift frequently.[2]  For example, despite the federal government's guidance to stay

---

[1] Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. Is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://www.vice.com/en_ca/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits.

*See also* Daniel A. Gross, *"It Spreads Like Wildfire": The Coronavirus Comes to New York's Prisons*, The New Yorker (Mar. 24, 2020), https://www.newyorker.com/news/news-desk/it-spreads-like-wildfire-covid-19-comes-to-new-yorks-prisons; Josiah Bates, *'We Feel Like All of Us Are Gonna Get Corona.' Anticipating COVID-19 Outbreaks, Rikers Island Offers Warning for U.S. Jails, Prisons*, Time (Mar. 24, 2020), https://time.com/5808020/rikers-island-coronavirus/; Sadie, Gurman, *Bureau of Prisons Imposes 14-Day Quarantine to Contain Coronavirus*, WSJ (Mar. 24, 2020), https://www.wsj.com/articles/bureau-of-prisons-imposes-14-day-quarantine-to-contain-coronavirus-11585093075; Cassidy McDonald, *Federal Prison Workers Say Conflictings Orders on Coronavirus Response Is Putting Lives at Risk*, CBS News (Mar. 19, 2020), https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/.

[2] Emma Grey Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*, Wired (Mar. 24, 2020), https://www.wired.com/story/coronavirus-covid-19-jails-prisons/.

inside and many states' stay-in-place orders, many prosecutors are still arresting individuals and seeking detention.[3]   Pre-trial detention facilities are still accepting new inmates who are coming from communities where COVID-19 infection is rampant.   As of today's date, the Bureau of Prisons is still moving inmates from facility to facility, including prisoners in New York.[4]

7.     Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons.   Inmates share small cells, eat together and use the same bathrooms and sinks.   They eat together at small tables that are cleaned only irregularly.   Some are not given tissues or sufficient hygiene supplies.[5]   Effective social distancing in most facilities is virtually impossible, and crowding problems are often compounded by inadequate sanitation, such as a lack of hand sanitizer or sufficient opportunities to wash hands.[6]

**Inmate Populations Also Have the Highest Risk of Acute Illness and Poor Health Outcomes if Infected with COVID-19.**

8.     There are more than 2.3 million people incarcerated in the United States[7]

---

[3] Stephen Rex Brown, *'Business as Usual' For Federal Prosecutors Despite Coronavirus, Nadler Writes, Calling for Release of Inmates*, N.Y. Daily News (Mar. 20, 2020), https://www nydailynews.com/new-york/ny-nadler-doj-inmates-20200320-d6hbdjcuj5aitppi3ui2xz7tjy-story html.

[4] Courtney Bublé, *Lawmakers, Union Urge Halt to All Prison Inmate Transfers*, Government Executive (Mar. 25, 2020), https://www.govexec.com/management/2020/03/lawmakers-union-urge-halt-all-prison-inmate-transfers/164104/; Hamilton, *Sick Staff, Inmate Transfers*; Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates*, ABC News (Mar. 23, 2020),https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416.

[5]  Justine van der Leun, *The Incarcerated Person Who Knows How Bad It Can Get*, Medium (Mar. 19, 2020), https://gen.medium.com/what-its-like-to-be-in-prison-during-the-coronavirus-pandemic-1e770d0ca3c5 ("If you don't have money, you don't have soap or tissues."); Keri Blakinger and Beth Schwartzapfel, *How Can Prisons Contain Coronavirus When Purrell Is a Contraband?*, ABA Journal (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[6] Rosa Schwartzburg, *'The Only Plan the Prison Has Is to Leave Us To Die in Our Beds'*, The Nation (Mar. 25, 2020), https://www.thenation.com/article/society/coronavirus-jails-mdc/.

[7] Kimberly Kindy *et al.*, *'Disaster Waiting to Happen': Thousands of Inmates Released as Jails and Prisons Face Coronavirus Threat*, Washington Post (Mar. 25, 2020), https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story html.

approximately 16% of whom are age 50 or older.[8]  The risk of coronavirus to incarcerated seniors is high.  "Their advanced age, coupled with the challenges of practicing even the most basic disease prevention measures in prison, is a potentially lethal combination."[9]  To make matters worse, correctional facilities are often ill-equipped to care for aging prisoners, who are more likely to suffer from chronic health conditions than the general public.

9.      An estimated 39-43% of all prisoners, and over 70% of older prisoners, have at least one chronic condition, some of the most common of which are diabetes, hypertension, and heart problems.[10] According to the CDC, each of these conditions—as well as  chronic bronchitis, emphysema, heart failure, blood disorders, chronic kidney disease, chronic liver disease, any condition or treatment that weakens the immune response, current or recent pregnancy in the last two weeks, inherited metabolic disorders and mitochondrial disorders, heart disease, lung disease, and certain neurological and neurologic and neurodevelopment conditions[11]—puts them at a "high-risk for severe illness from COVID-19."[12]

---

[8] Brie Williams *et al.*, *Strategies to Optimize the Use of Compassionate Release from US Prisons*, 110 AJPH S1, S28 (2020), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305434; Kimberly A. Skarupski, *The Health of America's Aging Prison Population*, 40 Epidemiologic Rev. 157, 157 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5982810/.

[9] Weihua Li and Nicole Lewis, *This Chart Shows Why the Prison Population is So Vulnerable to COVID-19*, The Marshall Project (Mar. 19, 2020), https://www.themarshallproject.org/2020/03/19/this-chart-shows-why-the-prison-population-is-so-vulnerable-to-covid-19.

[10] Brie A. Williams *et al.*, *How Health Care Reform Can Transform the Health of Criminal Justice-Involved Individuals*, 33 Health Affairs 462-67 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4034754/; Brie A. Williams *et al.*, *Coming Home: Health Status and Homelessness Risk of Older Pre-release Prisoners*, 25 J. Gen. Internal Med. 1038-44 (2010), *available at*  https://link.springer.com/content/pdf/10.1007/s11606-010-1416-8.pdf; Laura M. Maruschak *et al.*, *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, U.S. Dept of Justice (Oct. 4, 2016), at 5, *available at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[11] Harvard Health Publishing, *Coronavirus Research Center*, Harvard Medical School (Mar. 25, 2020), https://www health harvard.edu/diseases-and-conditions/coronavirus-resource-center.

[12] Centers for Disease Control and Prevention, *Coronavirus Disease 2019: People Who Are at Higher Risk*, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk html (last updated Mar. 22, 2020).

10.     However, even many young federal prisoners suffer from asthma, rendering them also very vulnerable to coronavirus.[13]

11.     But it is not only the elderly, or those with preexisting medical conditions that are at risk of coronavirus in a correctional setting.  As of March 23, 2020, New York City reported that "[p]eople ranging in ages from 18 to 44 have accounted for 46 percent of positive tests."[14] Across the United States, 38% of those hospitalized are between the ages of 20 and 54 and 12% of the intensive care patients are between 20 and 44.[15]

12.     This data is of particular concern for inmate populations, since prisoners' physiological age *averages 10 to 15 years older* than their chronological age.[16]  Therefore, the consensus of those who study correctional health is that inmates are considered "geriatric, by the age of 50 or 55 years."[17]  It is not clear that prison health care administrations are taking accelerated ageing into account when determining the eligibility criteria for age-related screening tools and medical care protocols for coronavirus, potentially leaving large swathes of the prison population at risk.[18]

---

[13] Laura Maruschak, *Medical Problems of Jail Inmates*, Dep't of Justice (Nov. 2006), at p. 2, *available at* https://www.bjs.gov/content/pub/pdf/mpji.pdf.

[14] Kimiko de Freytas-Tamura, *20-Somethings Now Realizing That They Can Get Coronavirus, Too*, N.Y. Times (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/nyc-coronavirus-young.html.

[15] *Id.*

[16] Brie A. Williams *et al.*, *Aging in Correctional Custody: Setting a Policy Agenda for Older Prisoner Health Care*, 102 Am. J. Public Health 1475-81 (2012), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3464842/; *see also* Brie Williams *et al.*, *Detained and Distressed: Persistent Distressing Symptoms in a Population of Older Jail Inmates*, 64 J. Am. Geriatrics Soc. 2349-55 (2016), https://onlinelibrary.wiley.com/doi/pdf/10.1111/jgs.14310 ("For example, older jail inmates with an average age of 60 in this study reported poor or fair health [and] chronic lung disease . . . at rates similar to those reported by community-based lower income older adults with an average age of 72.").

[17] Brie A. Williams *et al.*, *The Older Prisoner and Complex Chronic Medical Care* 165-70 in World Health Organization, *Prisons and Health* (2014), https://pdfs.semanticscholar.org/64aa/10d3cff6800ed42dd152fcf4e13440b6f139.pdf.

13.     In one study, we found that inmates who died in hospitals were, on average, nearly two decades younger than non-incarcerated decedents, had significantly shorter hospitalizations, and had higher rates of several chronic conditions including cancer, liver disease and/or hepatitis, mental health conditions, and HIV/AIDS."[19]

**The Entire Community is at Risk If Prison Populations Are Not Reduced**

14.     As the World Health Organization has warned, prisons around the world can expect "huge mortality rates" from Covid-19 unless they take immediate action including screening for the disease.[20]

15.     As of March 24, 2020, at least 38 people involved in the New York City correctional system have tested positive for Covid-19.[21]   Already, three inmates and three staff at federal correctional facilities across the United States have tested positive for the coronavirus, according to the Federal Bureau of Prisons.[22]

16.     Jails and prisons are fundamentally ill-equipped to handle a pandemic.

17.     Medical treatment capacity is not at the same level in a correctional setting as it is in a hospital.  Some correctional facilities have no formal medical ward and no place to quarantine

---

[18] Brie A. Williams *et al*., *Differences Between Incarcerated and Non-Incarcerated Patients Who Die in Community Hospitals Highlight the Need For Palliative Care Services For Seriously Ill Prisoners in Correctional Facilities and in Community Hospitals: a Cross-Sectional Study*, 32 J. Pallitive Med. 17-22 (2018), *available at* https://journals.sagepub.com/doi/pdf/10.1177/0269216317731547.

[19] *Id.* at 20.

[20] Hannah Summers,  *'Everyone Will Be Contaminated'*: *Prisons Face Strict Coronavirus Controls*, The Guardian (Mar. 23, 2020), https://www.theguardian.com/global-development/2020/mar/23/everyone-will-be-contaminated-prisons-face-strict-coronavirus-controls.

[21] Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons.*

[22] Ryan Lucas, *As COVID-19 Spreads, Calls Grow to Protect Inmates in Federal Prisons*, NPR (Mar. 24, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/24/820618140/as-covid-19-spreads-calls-grow-to-protect-inmates-in-federal-prisons.

sick inmates, other than the facilities' Special Housing Unit (SHU).[23]  While the cells in the SHU have solid doors to minimize the threat of viral spread in otherwise overcrowded facilities, they rarely have intercoms or other ways for sick inmates to contact officers in an emergency.[24]  This is particularly dangerous for those with COVID-19 infection since many patients with COVID-19 descend suddenly and rapidly into respiratory distress.[25]

18.     Even those facilities that do have healthcare centers can only treat relatively mild types of respiratory problems for a very limited number of people.[26]  This means that people who become seriously ill while in prisons and jails will be transferred to community hospitals for care. At present, access to palliative care in prison is also limited.

19.     Corrections officers may also be particularly vulnerable to coronavirus due to documented high rates of diabetes and heart disease.[27]  Prison staff in Pennsylvania, Michigan, New York and Washington state have tested positive for the virus, resulting in inmate quarantines. In Washington, D.C., a U.S. marshal who works in proximity to new arrestees tested positive for the virus, meaning dozens of defendants headed for jail could have been exposed.[28]  In New York,

---

[23] MCC New York COVID 19 Policy Memo, Mar. 19, 2020, https://www.documentcloud.org/documents/6818073-MCC-New-York-COVID-19-Policy-Memo.html; Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[24] Brie Williams *et al.*, *Correctional Facilities in the Shadow of COVID-19: Unique Challenges and Proposed Solutions*, Health Affairs (Mar. 26, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full/.

[25] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19–Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[26] Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*; Li and Lewis, *This Chart Shows Why the Prison Population is So Vulnerable to COVID-19*.

[27] Brie Williams, *Role of US-Norway Exchange in Placing Health and Well-Being at the Center of US Prison Reform*, https://ajph.aphapublications.org/doi/10.2105/AJPH.2019.305444 (published Jan. 22, 2020).

[28] Zusha Elinson and Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, WSJ (Mar. 22, 2020), https://www.wsj.com/articles/jails-release-prisoners-fearing-coronavirus-outbreak-11584885600 ("We're all headed for some dire consequences," said Daniel Vasquez, a former warden of San Quentin and Soledad state prisons in

236 members of the New York Police Department have tested positive for coronavirus and 3,200 employees are sick, triple the normal sick rate.[29]   Two federal prison staffers have also tested positive.[30]

20.     For this reason, correctional health is public health. Decreasing risk in prisons and jails decreases risk to our communities.

21.     Reducing the overall population within correctional facilities will also help medical professionals spread their clinical care services throughout the remaining population more efficiently.   With a smaller population to manage and care for, healthcare and correctional leadership will be better able to institute shelter in place and quarantine protocols for those who remain. This will serve to protect the health of both inmates as well as correctional and healthcare staff.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated: San Francisco, California
        March 27, 2020

_____
Dr. Brie Williams

---

California. "They're in such close quarters—some double- and triple-celled—I think it's going to be impossible to stop it from spreading.").

[29] Erin Durkin, *Thousands of NYPD Officers Out Sick Amid Coronavirus Crisis*, Politico (Mar. 25, 2020), https://www.politico.com/states/new-york/albany/story/2020/03/25/thousands-of-nypd-officers-out-sick-amid-coronavirus-crisis-1268960.

[30] Elinson and Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*.

# EXHIBIT B

```
-  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  x
                                                        :
                                                        :
                                                        :
APPLICATION OF VULNERABLE                               :
                                                        :
INMATE FOR RELEASE FROM MCC                             :
                                                        :       AFFIDAVIT OF JONATHAN
                                                        :       GIFTOS, M.D.
                                                        :
                                                        :
                                                        :
                                                        :
-  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  X
```

I, Jonathan Giftos, hereby affirm as follows:

1.      I am a doctor duly licensed to practice medicine in the State of New York. I am board certified in internal medicine and addiction medicine.

2.      I am currently the Medical Director, Addiction Medicine & Drug User Health at Project Renewal and a Clinical Assistant Professor in the Department of Medicine at Albert Einstein College of Medicine.  I was previously the Clinical Director of Substance Use Treatment for NYC Health & Hospitals, Division of Correctional Health Services at Rikers Island. In that capacity, I was responsible for the diversion, harm reduction, treatment and reentry services for incarcerated patients with substance use disorders. I further served as the medical director of the Key Extended Entry Program (KEEP), the nation's oldest and largest jail-based opioid treatment program that provides methadone and buprenorphine to incarcerated patients with opioid use disorders. I successfully led an effort to remove non-clinical barriers to opioid treatment program enrollment in 2017, which dramatically expanded treatment access from 25% to over 80%, while also reducing post-release mortality for people with opioid use disorder.

3.      I have extensive experience working with vulnerable populations such as the incarcerated and those experiencing homelessness.

4.      I submit this affidavit in support of vulnerable defendants' (as defined by the CDC) Motion for Temporary Release from Custody during the COVID-19 pandemic.

## I.      Coronavirus Epidemic in New York City

5.      On March 11, 2020, the World Health Organization declared that the rapidly spreading outbreak of COVID-19, a respiratory illness caused by a novel coronavirus, is a pandemic, announcing that the virus is both highly contagious and deadly.[1]  To date, the virus is known to spread from person-to-person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[2]  The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown.[3]  Experts are still learning how it spreads.

6.      As of March 18, 2020, novel coronavirus has infected over 193,475 people, leading to 7,864 deaths worldwide.[4]  In the United States, there are at least 5,881 confirmed cases and there have been at least 107 deaths.[5] There are confirmed coronavirus cases in every state, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands.

---

[1]  World Health Organization, Media Briefing on March 11, 2020:
https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] Centers for Disease Control and Prevention, Coronavirus Disease 2019: *How it Spreads,*
https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html

[3] *Id.*

[4]  *Novel Coronavirus Situation Dashboard*,  World Health Organization
https://experience.arcgis.com/experience/685d0ace521648f8a5beeeee1b9125cd.

[5] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (March 18, 2020), *at*
https://nyti.ms/2U4kmud (updating regularly).

7.      Governor Cuomo declared a State of Emergency in New York State on March 7, 2020.  Mayor De Blasio declared a State of Emergency in New York City on March 12, 2020.  As of March 18, 2020, there are 2,382 positive cases in New York State with 1,339 of those cases being in New York City.[6]  Among the positive cases in New York City are a number of people who work in courthouses, law enforcement, legal offices, and the medical field, increasing the likelihood of exposure to and by inmates: a security officer and an agent in the U.S. Attorney's Office, SDNY;[7] a NYC Department of Corrections investigator (who has died from the virus);[8] a lawyer with an office in Midtown Manhattan (and his wife and son);[9] a healthcare worker in Manhattan; an attorney and legal intern in local New York State courts; and an attorney at the Brooklyn Supreme Court.[10]

8.      There is currently no vaccine or cure.  The primary focus is on preventing the spread of the virus at this juncture. To prevent new infections, the Centers for Disease Control and Prevention strongly recommend the following actions: thorough and frequent handwashing, cleaning surfaces with EPA approved disinfectants, keeping at least 6 feet of space between people,

---

[6] *Information on Novel Coronavirus,* New York Department of Health, https://www.health.ny.gov/diseases/communicable/coronavirus (last visited March 17, 2020).

[7] Email Communication with Edward Tyrrell, U.S. Attorney's Office, SDNY (March 14, 2020).

[8] *NYC Corrections Officer Dies of Coronavirus*, https://www.pix11.com/news/coronavirus/nyc-correction-officer-dies-of-coronavirus

[9] *Midtown Lawyer, Family and Friends Test Positive,* https://www.nbcnewyork.com/news/local/nyc-attorney-in-critical-condition-city-works-to-trace-movements-awaits-more-tests/2311723/

[10] *Information about Coronavirus and New York State Courts*, https://www.nycourts.gov/whatsnew/covid.shtml; *see also Two People with Coronavirus were in Manhattan and Brooklyn Courts, https://twnews.us/us-news/two-people-with-coronavirus-were-in-manhattan-brooklyn-courts.*

and avoiding group settings.[11]  Social distancing has also been encouraged to slow the rate of COVID-19 infections so that hospitals have the resources to address infected individuals with urgent medical needs.[12] The President's *Coronavirus Guidelines for America*, to slow the spread of the coronavirus, warns that social gatherings in groups of more than 10 people should be avoided.[13]  In correctional settings, such sanitation, social distancing, and self-quarantining measures are nearly impossible especially when inmates are routinely shackled and escorted with other prisoners.[14]

**Certain Identifiable Populations Are Far More Vulnerable To COVID-19 Than The Population At Large Is.**

9.      The Centers for Disease Control have identified two groups of people at higher risk of contracting and succumbing to COVID-19: adults over 60 years old and people with chronic medical conditions.[15]

10.      COVID-19 is more dangerous to persons in these high-risk groups than to the general population.  Older people who contract COVID-19 are more likely to die than people under the age of 60.  In a February 29th WHO-China Joint Mission Report, the preliminary mortality rate analyses showed that individuals age  60-69 had an overall  3.6% mortality rate and those 70-79

---

[11]  *How to Protect Yourself*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html.

[12]  *Coronavirus, Social Distancing, and Self-Quarantine*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

[13] *The President's Coronavirus Guidelines for America*, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

[14] *See We Are Not a Hospital: A Prison Braces for the Coronavirus*, New York Times, March 18, 2020, https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[15] *If You Are at Higher Risk*, Centers for Disease Control and Prevention, https://tinyurl.com/vtbebzc; *see also Report of the WHO-China Joint Mission on Coronavirus Disease (COVID-19)*, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf at 12.

years old had an 8% mortality rate.[16]  For individuals 40 years and younger, the mortality rate was

as low as .2%.  It has been found that older people diagnosed with COVID-19 are more likely to

be very sick and require hospitalization to survive because the acute symptoms include respiratory

distress, cardiac injury, arrhythmia, septic shock, liver dysfunction, kidney injury and multi-organ

failure.   Access to a mechanical ventilator is often required.   People with chronic medical

conditions (no matter their age) are also at significantly greater risk from COVID-19 because their

already-weakened systems are less able to fight the virus. These chronic medical conditions

include lung disease, cancer, heart failure, cerebrovascular disease, renal disease, liver disease,

diabetes, immunocompromising conditions, and pregnancy.   Those with pre-existing medical

conditions have a higher probability of death if infected. The WHO-China Joint Mission Report

provides that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes,

8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[17]

In a March 17th *Washington Post* article tracking the 100 United States COVID-19

deaths, it is reported that many of the fatalities had underlying medical conditions, which made it

harder for their bodies to fight off COVID-19.  And nearly all — about 85 percent — were older

than 60; about 45 percent were older than 80.[18]

**Correctional Settings Increase The Risk Of Transmission**

11.      Correctional settings increase the risk of contracting an infectious disease, like

COVID-19, due to the high numbers of people with chronic, often untreated, illnesses housed in a

---

[16] *Age, Sex, Existing Conditions of  COVID-19 Cases and Deaths* Chart,
https://www.worldometers.info/coronavirus/coronavirus-age-sex-demographics/ (data analysis based on WHO-
China Joint Mission Report, *supra*).
[17] *Report of the WHO-China Joint Mission on Coronavirus Disease (COVID-19)*,
https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf at 12.

[18] *U.S. Coronavirus Death Toll Reaches 100*, The Washington Post, March 17, 2020, at
https://www.washingtonpost.com/national/us-coronavirus-death-toll-reaches-100/2020/03/17/f8d770c2-67a8-11ea-
b313-df458622c2cc_story.html.

setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others. Correctional facilities house large groups of inmates together, and move inmates in groups to eat, do recreation, and go to court. They frequently have insufficient medical care for the population, and, in times of crisis, even those medical staff cease coming to the facility. Hot water, soap and paper towels are frequently in limited supply. Inmates, rather than professional cleaners, are responsible for cleaning the facilities and often not given appropriate supplies. This means there are more people who are susceptible to getting infected all congregated together in a context in which fighting the spread of an infection is nearly impossible.

12.     Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[19]

13.     Inmates in New York City have already begun to test positive for COVID-19.[20] An inmate at Rikers and an inmate at Nassau County Correctional Facility (which houses both state and federal pre-trial detainees) tested positive this week.[21]  A corrections officer at Rikers has also tested positive.[22]

---

[19] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

[20] *Rikers Island Inmate Tests Positive for Coronavirus, in a First for New York City*, New York Magazine (March 18, 2020).

[21] *Id.*; *Nassau County Jail Inmate Tests Positive*, https://www.pix11.com/news/coronavirus/inmate-at-nassau-county-jail-long-island-tests-positive-for-coronavirus-officials.

[22] *Rikers Island Inmate Tests Positive for Coronavirus, in a First for New York City*, New York Magazine (March 18, 2020).

**Specific Conditions At MCC New York**

14.     Based on my understanding of the specific conditions at the federal pre-trial detention center in Manhattan ("MCC") as contained in published reports and communicated to me by Deirdre D. von Dornum, Attorney-in-Charge of the Federal Defenders of New York, these conditions pose heightened risks to already vulnerable inmates of contracting the novel coronavirus and of developing acute symptoms from the virus.

15.     The size of the population and the conditions of confinement at MCC increase the risk of infection substantially, because it is impossible for inmates to maintain a 6-foot distance from others, to avoid large groups, or to implement sufficient hand-washing and sanitization of surfaces.

a.     Approximately 750 inmates are held at the MCC, at least 10% of whom (and likely a higher percentage) fall into the high risk groups identified by the CDC.[23]  The facility was designed to hold only 474 inmates.[24]

b.     New inmates arrive at MCC from all over the world each week.  The pace of new incarcerations has not slowed despite the coronavirus.  These new inmates, who have been living in the community as coronavirus spreads, are screened only for fever and recent travel to designated hotspot countries before joining the general population of inmates.[25]

c.     Correctional officers who live in New York, New Jersey, and Pennsylvania come in and out of the facility each day without medical screening.[26]  Significantly, in a March

---

[23] Statement of Warden Licon-Vitale (March 12, 2020) (approximately 10% of inmates at MCC are high-risk for COVID-19 within the CDC's definition).

[24] *The Real Scandal at the MCC*, The Atlantic (Aug. 16, 2019).
[25] *Id.*

[26] *Id.*

18th CDC report, an epidemiological investigation revealed that coronavirus-infected staff members contributed to the outbreak in a nursing home facility with ineffective infection control and prevention and staff members working in multiple facilities.[27] The Seattle nursing home outbreak demonstrates that individuals with underlying health conditions and advanced age, in a shared location, are at a high risk of death, especially when resources and staffing become inadequate.[28]

d.   Male inmates in the general population at MCC are housed either in small two-man cells (originally designed for single occupancy) with a single shared toilet and sink or in large open dormitory units housing approximately 30 inmates with shared toilets and sinks. The windows in the cells do not open.  Recreation on the roof is available for at most one hour a day.  In the wake of a recent lockdown preceding the COVID-19 lockdown, one of only two toilets on a dormitory unit was broken, leaving over 25 men to share a single toilet and two sinks.

e.   There is a small unit for approximately 30 female inmates, who are housed in two-woman cells with a shared sink and toilet.  No outside recreation is available to female inmates at MCC.  The windows on the unit do not open.   Several of the female inmates have chronic medical conditions.

f.   During the preceding lockdown, the MCC housing units were not cleaned for two weeks because the inmates, who are responsible for cleaning the institution, were locked in their cells.[29]   In addition, there was no laundry available, and inmates were forced to

---

[27] *COVID-19 in a Long-term Care Facility—King County Washington, February 27-March 9, 2020,*
https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e1-H.pdf.

[28] *Id.*

[29] Statement of Warden Licon-Vitale at SDNY Meeting on BOP and Coronavirus (March 12, 2020).

sleep on the same sheets and wear dirty clothes for the entire period.[30]  Female inmates who were menstruating were denied sanitary napkins or other feminine hygiene items and forced to wear a single pair of underwear for the entire two week period.

g.  No hand sanitizer is currently available to inmates at MCC.[31]

h. Tissues are not readily available.  Inmates use toilet paper to blow their noses.  Each inmate is provided only one roll of toilet paper per week.

i.     Each inmate is given one small bar of soap a week, at most[32].  Access to additional soap is limited to those inmates who have sufficient commissary funds to purchase it, and dependent on the commissary being open; it is routinely closed during lockdowns.[33]

j.     Inmates prepare all inmate meals and this meal preparation, with the exception of kosher and halal meals, is performed in a single kitchen.

k.     Inmates eat meals in large groups.

l.     Inmates are responsible for sanitizing the housing unit common areas, and frequently lack adequate cleaning supplies to do so.

m.     Inmates have not been informed of the symptoms of COVID-19, or of how to prevent the spread of the infection.

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

n.  The facility has not informed the inmate population of what the protocol will be for symptomatic inmates;[34] absent a transparent protocol, inmates in correctional settings often fear they will be confined in solitary if they volunteer that they are symptomatic.

16.     Inmates at MCC who do contract COVID-19 are at higher risk for developing acute symptoms than if they were in the community, because MCC lacks the medical resources to care for symptomatic inmates.

   a.     There is no separate medical unit or facility for ill inmates.[35]  Unlike many Federal Correctional Institutions and even Rikers' Island, MCC has no physical space in which an ill inmate can convalesce that is separate from other inmates, warm, clean and has access to fresh water and regular hand-washing.

   b.     On weekdays, there are only two doctors regularly available at MCC to care for all 750 inmates.  Even this highly limited number is likely to decrease as doctors themselves go into quarantine.  Neither of these doctors specialize in infectious diseases.

   c.     There are no doctors at MCC on weekends or evenings.

   d.     People who contract COVID-19 can deteriorate rapidly, even before a test result can be received.  They need constant monitoring. Most people in the higher risk categories will require more advanced support: positive pressure ventilation, and in extreme cases, extracorporeal mechanical

---

[34] *Id.*

[35] *Id.*

oxygenation. Such care requires specialized equipment in limited supply as well as an entire team of specialized care providers.   MCC has neither specialized equipment nor specialized care providers.

17.    MCC is already short-staffed.[36]   This staffing shortage will only increase as employees need to stay home to care for children whose schools are closed, elderly family members, and other personal health situations.  With fewer staff, correctional officers are less able to monitor inmates' health.

**Reducing Population Size At Specific Correctional Facilities Is A Crucial Public Health Measure**

18.    Every effort should be made to reduce chances of exposure to the novel coronavirus; however, given the proximity and high number of inmates, correctional staff, and healthcare workers at pre-trial detention facilities, it will be extremely difficult to sustain such efforts. Therefore, it is an urgent priority to reduce the number of people in detention facilities during this national public health emergency.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: March 18 , 2020
           Brooklyn, New York

_____
Dr. Jonathan Giftos

---

[36] *Id.*

11